JAMES B. KENLEY, M.D.,

STATE HEALTH COMMISSIONER

v.

WATERWAY ESTATES, Ltd., et al.

No. 0865-85

Decided September 2, 1986

COUNSEL

Cynthia V. Bailey, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellant.

Allen J. Gordon, for appellee.

OPINION

**BENTON, J.** — The Chesapeake Health Department denied John W. Keffer and Waterway Estates, Ltd., a permit to build a septic system. The hearing officer who reviewed the denial recommended that the State Health Commissioner approve the permit conditioned on the removal of fill material; however, James B. Kenley, M.D., the State Health Commissioner (the Commissioner), affirmed the denial of the permit. Upon Keffer's petition for review under Code § 32.1-164.1, the circuit court held that the Commissioner's action was "arbitrary and inconsistent" and that "reasonable minds would come to a different conclusion." Our review of the record leads us to conclude that the Commissioner's decision was supported by substantial evidence and that the circuit court erred in reversing his decision.

The facts as developed during the administrative hearing show that shortly after Keffer obtained an option to purchase a large tract of property, which included the currently designated Lot 50, R. L. Shelor, Sanitarian Supervisor for the Chesapeake Health Department (the Department), informed Keffer of a soil evaluation report concerning the property and indicated that some portions of the property contained moderately to well drained soils and could be subdivided into lots of 20,000 square feet minimum; that some portions had marginal and somewhat poorly drained soils suitable for three acre lots; and that the balance of the property had poorly drained soils which could not be approved under any circumstances. Keffer was told that he would have to submit a drainage plan if the property was to be developed. Keffer purchased the property in September, 1976.

On March 17, 1977, Keffer's retained engineers reported the results of an evaluation of the property's soil for use as sewage

disposal fields. The soil in Lot 50, the land at issue in this appeal, was reported to be "very capable for disposal systems, especially with the existing ditch and its proposed expansion." The evaluation was performed during a period of heavy rainfall and reported groundwater in areas other than Lot 50. A site map attached to the engineers' report indicates, however, that only one test hole was bored on Lot 50.

On May 11, 1977, William Hoddinott, Shelor's successor in the Department, wrote to Keffer approving a subdivision plat of the property, including Lot 50, subject to several stipulations, including (1) that no lot would be less than 20,000 square feet and (2) that the Department reserved the right to require site plans from future building permit applicants showing, *inter alia*, underground utilities. The purpose of the second condition was:

> to assure that our septic systems can be placed in the Woodstown or better soils on the lots and that wells can be placed to conform with State regulations.

Hoddinott had no recollection of inspecting Lot 50 in 1977; he testified at the formal agency hearing that in 1977 the Department did not approve subdivision plats by lot and that the approval with conditions had been based upon the soil evaluation report prepared by Keffer's engineers. As a "rule of thumb," he testified, the health authorities were approving subdivision plats in 1977 if 50 percent of each lot contained "Woodstown" soil.

On May 20, 1983, George Crumpler, a Department sanitarian, denied an application by Gill Construction Company, the purchaser of Lot 50, for a septic system construction permit. The reason given for the denial was the presence of 24 to 30 inches of fill on the lot. Crumpler, Hoddinott and Keffer met on Lot 50 three days later. Hoddinott and Crumpler bored 11 test holes on Lot 50 where Keffer indicated conditions were most favorable for a septic system drainfield. Ten borings disclosed 4 to 24 inches of fill over gray soil; the eleventh hole revealed acceptable soil. Hoddinott advised Keffer that "a satisfactory septic system cannot be put into this lot due to the soil and water table characteristics." Hoddinott said at the formal hearing that he observed no free water in the holes drilled on May 23 but that the gray coloration, called "gray mottling," indicated an unacceptably high seasonal water table. Keffer executed a purchase agreement release with Gill Construc-

tion Company due to the septic system application denial.

On June 30, 1983, Dr. S. J. Kendra, Director of the Department, Hoddinott, Regional Sanitarians Frank Hall and Fred White, and soil scientist W. J. Meyer visited lot 50. Meyer bored several test holes. Keffer requested an informal hearing which was conducted by Dr. Kendra on the same date and at which Hoddinott, Crumpler, Hall and White concurred that a septic system could not be built on the lot due to water table characteristics. At the informal hearing Keffer noted that the Department had approved the subdivision in 1977 and that a drainage ditch adjacent to Lot 50, which was installed after the 1977 approval, would allow a properly functioning septic system. Following the hearing, soil scientist Meyer reported his evaluation of six test holes of approximately five feet depths. Meyer found an upper level of fill in each hole and gray sandy loam beneath the fill. He reported:

> The problems are highly compacted surface soil over part of the lot, a seasonal water table as indicated by gray colors and expected slow rates of absorption in the heavy clay loam horizons.

Dr. Kendra rejected Keffer's application for a permit.

Subsequent to the formal agency hearing, a hearing officer appointed by the State Board of Health to review Dr. Kendra's decision allowed Keffer additional time in which to offer further proof. This was done because Keffer indicated a willingness to remove the fill material from Lot 50 and asserted that the water table was not as close to the surface as the gray mottling disclosed by the soil tests indicated. The parties thereafter submitted additional soil evaluation reports and analyses of Lot 50.

Keffer wrote to the hearing officer on December 28, 1983, enclosing a soil evaluation prepared by Danny Meadows, a soil scientist retained by Keffer. Meadows reported that he had drilled three holes to 65 inch depths, discovered no free water in the holes and found the water table no closer than 18 inches from the surface, assuming removal of the overlying fill. Meadows reported that the soil was drier than the gray mottling indicated, and that, in light of recent heavy rain, a rising water table would have occurred if it were a possibility. He concluded that the absence of a rising water table was proof that artificial drainage of Lot 50 was

working. Keffer informed the hearing officer that he would place a septic system drainfield no closer than 50 feet of the drainage ditch.

Hoddinott, by letter, informed the hearing officer of the Department's policy against taking artificial drainage into account in evaluating septic systems for lots under three acres. Hoddinott also questioned Meadows' conclusion as to the depth of the water table, stating that a mid-December evaluation would not coincide with the time of the seasonal high level which occurred in late winter and spring.

Soil scientist Meyer explained in a report to the State Department of Health that the absence of free water, as reported by Meadows, was expected after a heavy rain. Meyer reported as follows:

> The soil colors indicate that the soil under natural conditions was saturated for extended periods. Drainage of the soil removes the free water, but still leaves the water held at field capacity. The problem is to determine how effective the drainage ditch is in removing the free water because such drainage or draw down of internal free water occurs on a curve with the lowest point at the ditch and the highest point away from the ditch where lateral movement does not effect the free water. This evaluation cannot be done on a short-time test because of the time required to accumulate the water needed to saturate the soil.

> Since drainage only removes the free water, the addition of waste water when the soil is at field capacity, can only result in drainage of the waste water to the ditch. Thus, distance is needed to provide some renovation. The question is to determine during the wettest period of the year, when soil is full of water, how far from the ditch that the free water is draining laterally and is this distance enough to renovate pollutants carried in the water and provide area beyond that point for a drainfield.

The hearing officer concluded that Lot 50, as part of the previously approved subdivision, should be evaluated for a septic system permit according to the State Board of Health's 1971 Regula-

tions, and he also concluded from the policy allowing artificial drainage on three-acre lots and the grandfather clause in the State Board of Health's 1982 Regulations that:

[T]he probability of failure is not the only consideration in granting permits. Prior behavior of [the] approving authority is relevant on the question of approval.

The hearing officer recommended that a permit be granted with the condition that the fill material be removed.

After reviewing the entire record, the Commissioner rejected the recommendation of the hearing officer and affirmed the Department's denial of a septic system permit on two grounds. First, the presence of fill on the lot increased the likelihood of system failure. The Commissioner indicated in a letter explaining his decision that removal of the fill might alleviate this problem. Second, the presence of gray soil beneath the fill indicated a high seasonal water table. The Commissioner found that the Department proved "gray soil at depths too shallow to support a septic tank drainfield, even under the 1971 standards." Such proof, the Commissioner stated, shifted the burden to Keffer to show a lowering of the water table by artificial drainage. Although the Commissioner wrote that he would reconsider his decision after more extensive evaluation, he also noted that the Department had offered unrebutted evidence that the drainage ditch might draw untreated waste water.

Page Herbert, Keffer's consulting engineer, was the only witness who was called at the circuit court hearing. He testified that he drilled a number of test holes to 65 inch depths in 1977 during the seasonal high water table. Herbert said that he had no record or recollection of finding water in the holes. He also explained that gray coloration was not necessarily indicative of a high water table. Herbert testified that his 1977 test borings were not made for the purpose of evaluating the suitability of soil for installation of septic tanks on individual lots.

The Administrative Process Act limits a court's review "to ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did." Code § 9-6.14:17.

The "substantial evidence" standard, adopted by the General Assembly, is designed to give stability and finality to the fact-findings of an administrative agency. The phrase "substantial evidence" refers to "such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion." Under this standard, applicable here, the court may reject the agency's findings of fact "only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion."

*Virginia Real Estate Commission v. Bias*, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983)(citations omitted)(emphasis in original). Furthermore, in reviewing agency action, a court must also "take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." Code § 9-6.14:17.

It is apparent to us that there was substantial evidence in the administrative record to support the findings of the Commissioner and his denial of the septic system permit. The central issue before the Commissioner was whether the soil conditions on Lot 50 would prevent proper functioning of a septic system.

All of the evidence in the record supports the finding that the addition of fill material to the surface of the lot created conditions that increased the risk of early septic system failure and of hazardous health conditions. The Commissioner's findings concerning the unsuitability of fill material on the lot were supported by testimony of Meyers, the Department's soil scientist, that water has a tendency to travel along the point of contact between the fill material and the natural soil rather than continuing to flow downward into the natural soil. Keffer's consulting soil scientist, Meadows, without addressing the issue of the flow of water across the contact zone, questioned in a letter whether the sandy loam fill material on Lot 50 would pose a problem. Meadows acknowledged, however, that the Department's regulations did not allow septic systems to be installed in fill material and recommended that the fill material be avoided or removed.

The evidence before the Commissioner also showed gray coloration in the soil samples which indicated a high seasonal water table and which also made the lot unsuitable for a septic system. Both the 1982 and 1971 Regulations of the State Board of Health address the matter of soil coloration. The 1982 Regulations provide that color is a key indication of a soil's suitability. Gray color or gray mottlings indicate seasonal water tables of at least three weeks duration. State Board of Health, Sewage Handling and Disposal Regulations § 4.05.01(b)(1982). The 1971 Regulations, which applied to Keffer's permit application, do not set out specific standards as to gray soil coloration. Nevertheless they do provide as follows:

Soil evaluation for a drainfield system shall follow a systematic approach including consideration of physiographic province, position of landscape, degree of slope and soil profile (thickness of horizon, color, texture). Such evaluation shall indicate whether or not the soil has problems relative to the position in the landscape, seasonal water table, shallow depths, rate of absorption, or a combination of any of the above. If absorption rate problems are suspected and there is no indication of a water table, percolation tests should be made but their result shall not be presumptive, prima facie or conclusive evidence as to the suitability for effluent absorption.

State Board of Health, Rules and Regulations Governing the Disposal of Sewage Part III, Article 1 § (B)(7) (1971).

Thus, the 1971 Regulations required analysis of the effect of the water table on a septic system. The record contains testimony of experts that the seasonal high water table under Lot 50, as indicated by soil evaluation, would cause early failure of a septic system and create a public health hazard. The Commissioner acknowledged that there was conflicting testimony but concluded that the evidence proved the existence of a seasonal water table at depths too near the surface of Lot 50 to support a properly functioning septic system, even under the 1971 standards. This finding was supported by substantial evidence in the form of testimony from Hoddinott, Meyer and White. The first report from Meadows, finding no free water in the test borings, was inconclusive because his tests were not conducted at a time when the water

table would tend to be at its seasonal high. Herbert, whose 1977 test borings were not made with a view to testing for the suitability of installing a septic system, testified that color of the soil was inconclusive. He had no notes that indicated free water was found, but he could not remember whether he found water on Lot 50 in 1977 when he made borings.

The Commissioner's finding that Keffer failed to substantiate his assertion that the water table had been artificially lowered by the creation of a ditch along the edge of the property is borne out by the record. Furthermore, the record contains unrebutted testimony by Meyers that the installation of a septic system in the lot could cause untreated waste water to flow into the ditch, posing a threat to public health because the ditch has the effect of artificially lowering the water level by draining the lot.

The record does not support a finding that the Department was arbitrary, inconsistent, or unfair in its dealings with Keffer. He was apprised in 1977 of soil conditions and the potential problem of placing septic systems on the lots; consequently, the Department cannot now be found to have acted arbitrarily and inconsistently. The Department has made every effort to assist Keffer in resolving a difficult problem; furthermore, the Commissioner in his final decision offered to reconsider if further testing indicated that the septic system could be safely installed.

We conclude that in viewing the record as a whole reasonable minds would not necessarily come to a different conclusion regarding the operation of a septic system on Lot 50; for this reason, we hold that the ruling of the circuit court was erroneous. The decision of the circuit court, therefore, is reversed and final judgment is entered.

*Reversed and final judgment entered.*

Duff, J., and Cole, J., concurred.