COURT OF APPEALS OF VIRGINIA


Present:   Judges Petty, Alston and Senior Judge Willis
Argued at Richmond, Virginia


EDWARD A. WILLIAMS
                                                        OPINION BY
v.        Record No. 2799-09-2              JUDGE ROSSIE D. ALSTON, JR.
                                                   SEPTEMBER 14, 2010
COMMONWEALTH OF VIRGINIA
   REAL ESTATE BOARD


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Daniel T. Balfour, Judge

Brenda L. Page (Alan F. Duckworth; Page Law Firm, P.C.,
on briefs), for appellant.

Steven P. Jack, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Edward A. Williams (Williams) appeals a decision of the Circuit Court of Henrico

County, affirming the Commonwealth of Virginia Real Estate Board's (Board) decision to

revoke Williams's real estate license and impose $9,000 in fines against him.  Williams contends

the Board's findings are contrary to law, outside the specialized competence of the Board, in

violation of Williams's due process rights, and arbitrary and capricious.   For the reasons that

follow, we affirm in part and reverse in part.

I.  BACKGROUND

The underlying facts in this matter are highly contested, and rather convoluted.  In the fall

of 2004, Williams was a licensed real estate agent working for Virginia Real Estate and

Development, Inc. (VARED).  On December 8, 2004, Williams entered into an agreement to

individually purchase a 1.25-acre lot in Hanover County from Edward Waller (Waller) for

$7,000.[1] The agreement specified that Williams would make a $1.00 earnest money deposit with VARED, the escrow agent. The agreement also specified that Williams would pay delinquent taxes on the property, in the amount of $4,205.35, and related fees at closing. The agreement was signed by Waller and Williams and under Williams's signature was written, "Purchaser is a licensed real estate agent."

On January 5, 2005, the parties settled on the property. Contrary to the terms of the agreement, Williams never deposited $1.00 with the escrow agent. Further, the settlement statement noted that Waller, as opposed to Williams, paid delinquent taxes and fees totaling $6,106.95.

On March 23, 2005, Williams entered into an agreement to individually purchase a 7.5-acre lot adjacent to Waller's lot, from James Thacker (Thacker) for $35,000. The agreement specified that Williams would deposit $1,000 with Courthouse Title, LLC (Courthouse Title), the escrow agent, the same day the parties entered the agreement. The agreement was signed by both parties and included information relating to Williams's real estate license number and his employment with VARED. Williams and Thacker closed on the property on April 28, 2005. Despite the deadline set out in the agreement, Williams did not deliver a check to the escrow agent until at least April 12, 2005.[2]

On February 27, 2007, Michael Pintz (Pintz), the principal broker and owner of VARED and manager of Courthouse Title, filed a complaint with the Department of Professional and

---

[1] The original purchase price listed in the agreement was $6,000. That amount was stricken through and $7,000 was handwritten on the agreement. Both Waller and Williams initialed the change.

[2] The record indicates that Williams wrote a check for $1,000 to Courthouse Title on April 12, 2005. According to Williams, Williams's financial institution returned the check to Courthouse Title. When the parties closed on the property, Williams provided the $1,000 deposit. The record is not clear as to whether closing occurred on April 28, 2005, or May 5, 2005. In any event, the deposit was not made by March 23, 2005, as indicated in the agreement.

Occupational Regulation (Department), alleging Williams violated a number of the Department's regulations while facilitating the Waller and Thacker transactions. Pintz alleged, *inter alia*, that Williams failed to disclose his interest in the transactions; failed to disclose his brokerage relationship with VARED to the parties; failed to safeguard the interests of the public; engaged in a conflict of interest without obtaining the written consent of the parties; materially misrepresented the terms of the agreements; and failed to provide notice of material changes to the contracts.[3] In support of his complaint, Pintz forwarded to the Department a conversation he recorded with Waller, in which Waller explained his interactions with Williams. In the recording, Waller stated that Williams approached him and offered him $7,000 to purchase Waller's property. Waller noted that when Williams approached him, Waller was under the impression that he no longer owned the property because he failed to pay taxes on the property for several years. Waller stated that he willingly signed the purchase agreement with Williams, believing he would receive $7,000 from Williams. Waller then explained that Williams only paid Waller $444.42 at the closing on the property.

The Department conducted an investigation into the complaint, and on November 26, 2007, the Department offered Williams a "consent offer" of $4,250 in fines and completion of an ethics course.[4] Williams declined the offer.[5]

Accordingly, the Department scheduled an "informal fact-finding conference" (IFF) for March 26, 2008. Before the IFF, Williams suffered a subdural brain hematoma, which required

---

[3] In total, Pintz alleged Williams violated twelve provisions of the Virginia Administrative Code "[d]uring the period of his association as an agent with [VARED]."

[4] Pursuant to Code § 54.1-306(C), "an investigator may initiate an investigation based on any act, omission, or condition witnessed by the investigator and offer a consent agreement to the regulant to resolve any violation discovered during the [investigator's] inspection."

[5] The existence of the settlement offer is referenced only for the purpose of addressing one of Williams's claims against the Board.

brain surgery and rehabilitation. As a result, Williams requested a continuance of the IFF for "an uncertain duration."[6] The Department granted Williams's request for a continuance and scheduled the IFF for May 7, 2008.

On May 7, 2008, the parties proceeded with the IFF without a further request for a continuance from Williams or his counsel. The presiding Board member, Byrl Taylor (Taylor), conducted the hearing, in which Williams and Pintz testified. Neither Waller nor Thacker was present.

On June 4, 2008, Taylor provided a summary of the IFF and recommendation to the Board. Taylor found Williams failed to disclose his brokerage relationship to the parties in violation of Code § 54.1-2138 (Counts I and VII); failed to deposit $1.00 according to the terms of the Waller contract in violation of 18 VAC 135-20-180(B)(1)(a) (Count II); failed to act as a real estate salesperson in such a manner as to safeguard the interest of the public in violation of 18 VAC 135-20-260(10) (Count III); failed to include the complete terms and conditions of the Waller contract in violation of 18 VAC 135-20-300(6) (Count IV); and failed to provide timely written notice to all principals to the transactions of material changes to the contract in violation of 18 VAC 135-20-310(2) (Counts V and VIII).[7] Taylor recommended the Board impose $9,000 in fines against Williams and revoke his real estate license. On July 10, 2008, the Board accepted Taylor's recommendation.

---

[6] Williams listed four reasons for his continuance request: (1) Williams's health problems; (2) pending civil litigation among Williams, Pintz, Waller, and several other individuals; (3) unavailability of Williams's counsel on March 26, 2008; and (4) counsel's need for additional time to prepare for the hearing.

[7] Taylor recommended Count VI be dismissed, finding insufficient evidence to support the allegation that Williams improperly held the Waller escrow deposit upon instruction from Pintz.

Pursuant to Code § 2.2-4026, Williams appealed to the circuit court. Prior to a hearing in circuit court, Waller died.

On October 31, 2008, and April 23, 2009, Williams presented evidence to the circuit court in support of his claim that the Board's decision was erroneous. Williams elicited testimony from E. Nathan Matthews (Matthews), the Department's investigating officer, Taylor, and Doug Schroder (Schroder), the Director of the Department's adjudication team.

Matthews testified that in his investigation, he interviewed Pintz, Williams, an agent from Courthouse Title, and Jerald Huntsinger.[8] Matthews testified that he did not interview Waller and that he attempted to interview Thacker but Thacker did not want to participate. When Williams's counsel questioned Matthews as to why he did not interview Waller, Matthews stated that, in his opinion, he had sufficient information to evaluate the allegations against Williams without interviewing Waller.

Williams then questioned Schroder about the record presented to the Board. Specifically, Williams directed Schroder's attention to Matthews's investigative notes, the consent offer, and Taylor's notes from the IFF. Counsel asked why these documents, submitted to Taylor after the IFF but before the Board rendered its decision, were not presented to the Board. Schroder responded that the "record closes on the day the IFF is held," but "[i]f someone asks permission to leave the record open to submit additional information, the Board Member . . . has the authority to hold the record open." Schroder further noted that he provided this information to Williams and his counsel at the time of the IFF.

---

[8] Jerald Huntsinger, Pintz's business partner and real estate client, owned property near Waller and Thacker.

Williams also asked Schroder why the IFF took place without Waller present. Schroder testified that Waller was sick the day of the IFF. Further, Schroder noted that although Waller's name was listed on the hearing's "participant list," no one subpoenaed Waller for the IFF.

Finally, Williams questioned Taylor about her recommendation to the Board. Taylor testified that she reviewed Pintz's recorded interview with Waller but she did not ask Matthews to interview Waller further. Questioning Taylor's finding that Pintz was a credible witness, Williams noted that Pintz admitted that he routinely kept earnest money deposits in an operating account rather than his escrow account. Therefore, it was possible, as Williams claimed, that Pintz told Williams to keep the deposits on the contracts, rather than turn them over to the escrow agent. Taylor responded that if there was evidence suggesting Pintz violated the Department's regulations, she would have ordered an investigation of Pintz. Instead, Taylor specifically found Pintz credible.

Williams noted that Taylor, in her summary of the IFF and recommendation to the Board, specifically asked why Waller would sign the settlement statement when it indicated that Waller would pay closing costs and fees. In response, Taylor stated, "Mr. Waller did not have the education and did not understand, and I know that Mr. Williams as [r]ealtor knew what side of the settlement statement [closing costs] should be on and he let it go." Williams asked Taylor the basis for her other findings. Taylor noted that Williams made changes to the contract without informing the parties or having them initial the changes. Taylor stated that Williams failed to inform the parties in writing that Williams was not representing Waller or Thacker in the transactions. Further, Taylor noted that "[Williams] misrepresented . . . who was going to pay for the delinquent taxes." Finally, Taylor stated that "[t]he county assessment was higher than

any amount of money [Waller] got or received."[9]  When the court asked Taylor how she learned of the tax assessment when that information was not in the agency's record, Taylor responded that she found the information "online."  Taylor stated that she "did not rely on [the assessment]," but later admitted that it "was one of the reasons" for her opinion.

Williams also questioned Taylor about proceeding with the IFF after Williams informed Taylor that he suffered a brain hematoma.  Taylor testified that she only remembered granting Williams's request for a continuance.  Taylor noted that at the hearing, Williams "looked fine."

Prior to the circuit court's disposition, the court entered orders admitting into evidence Matthews's investigative notes and the consent offer.

On July 13, 2009, the circuit court issued a letter opinion, stating

> This Court may not have reached the same result but cannot substitute its judgment for the judgment of the Board, since the Board's decision is supported by the facts and the only matter relates to its sanctions.  The Court believes it unusual to have such a disparity in sanctions.  The Court also notes the investigator's failure to contact the sellers of the property.  The Board could have had more facts to consider had it talked to the ultimate seller, Mr. Waller, and had it further investigated the position of Mr. Pintz, who voluntarily interviewed the [s]eller.
>
> The Court notes that the original settlement offer of $4250.00 was more than doubled by the Board, which suggests motives of retaliation or pique.  Nonetheless, this Court finds the Board acted according to law, as the facts do not support that this Court "would necessarily come to a different conclusion."  Va. Real Estate Comm. v. Bias, 226 Va. 264 (1983).

The court denied Williams's motion for reconsideration and on October 19, 2009, the court entered a final order, *nunc pro tunc* to October 8, 2009, incorporating its letter opinion and affirming the Board's decision.  This appeal followed.

---

[9] Williams's counsel showed Taylor a tax assessment on the Waller property for $33,400, which counsel indicated she found on the internet.  Taylor stated that $33,400 was not the particular assessment she saw, but that the one she saw was less than $33,400 but "far more than what [Waller] was offered for the property."

## II.  ANALYSIS

On appeal, Williams contends the circuit court erred when it failed to dismiss the Board's findings, which Williams contends were contrary to law, outside the agency's specialized competence, in violation of Williams's due process rights, and arbitrary and capricious.  We address each of these arguments in turn.  In doing so, the analysis follows the structure of Williams's assignments of error, and thus overlaps the various "counts" set forth by the Board in its findings.

### A.  Findings Contrary to Law

In Counts I and VII of Taylor's summary of the IFF and recommendation to the Board, Taylor found Williams violated Code § 54.1-2138 by failing to disclose the fact that Williams had no brokerage relationship with Waller and Thacker.

Code § 54.1-2138(A) states

> Upon having a substantive discussion about a specific property or properties with an actual or prospective buyer or seller who is not the client of the licensee and who is not represented by another licensee, a licensee shall disclose any broker relationship the licensee has with another party to the transaction.

In her findings, Taylor noted, "I believe the intent of the statute is twofold.  If there is a brokerage relationship, it needs to be disclosed, and if there is no brokerage relationship, that too needs to be disclosed."  Taylor found that "Williams, who represented himself in the transaction, disclosed in the Waller contract that he was a real estate licensee, but failed to disclose to Waller, in writing, that there was no brokerage relationship as required by [Code] § 54.1-2138."  Further, Taylor found Williams failed to disclose to Thacker, in writing, that there was no brokerage relationship in the Thacker transaction.  Accordingly, Taylor recommended the Board impose a monetary penalty of $500 and eight hours of continuing education for each violation, which the

Board accepted. Williams contends the circuit court erred when it failed to reverse and dismiss the Board's findings as contrary to law.

"Where the agency has the statutory authorization to make the kind of decision it did and it did so within the statutory limits of its discretion and with the intent of the statute in mind, it has not committed an error of law . . . ." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988). However, whenever an "agency's statutory interpretation conflicts with the language of the statute or when the interpretation has not been consistently and regularly applied, the usual deference accorded to an agency's interpretation should be withheld." Commonwealth, Dept. of Mines, Minerals & Energy v. May Bros., 11 Va. App. 115, 119, 396 S.E.2d 695, 697 (1990) (citing Univ. of Richmond v. Bell, 543 F. Supp. 321, 327 (E.D. Va. 1982)).[10] "'An erroneous construction by those charged with its administration cannot be permitted to override the clear mandates of a statute.'" Hurt v. Caldwell, 222 Va. 91, 97, 279 S.E.2d 138, 142 (1981) (quoting Richmond v. Cnty. of Henrico, 185 Va. 176, 189, 37 S.E.2d 873, 879 (1946)). When the wording of a statute is clear and unambiguous, its plain meaning is to be accepted without resorting to rules of statutory interpretation. State Bd. of Contractors v. H.B. Sedwick, Jr., Bldg. Supply Co., 234 Va. 79, 83, 360 S.E.2d 169, 171 (1987) (citing Marsh v. City of Richmond, 234 Va. 4, 13, 360 S.E.2d 163, 168 (1987); Va. Dept. of Labor & Indus. v. Westmoreland Coal Co., 223 Va. 97, 99, 353 S.E.2d 758, 760-61 (1987); Ambrogi v. Koontz, 224 Va. 381, 386, 297 S.E.2d 660, 662 (1982)).

Code § 54.1-2138(A) clearly states, "[A] licensee shall disclose any broker relationship the licensee has *with another party to the transaction*." (Emphasis added). As Taylor found,

---

[10] Code § 54.1-2138 has not been "consistently and regularly applied" to licensees who fail to disclose the *lack of* a brokerage relationship. In fact, neither Williams nor the Board cites any case or Board decision in which Code § 54.1-2138 has been applied to sanction a licensee for failing to disclose the lack of a brokerage relationship.

neither VARED nor Courthouse Title was a party to the Waller and Thacker transactions. Moreover, neither VARED nor Courthouse Title was engaged in a brokerage relationship with Williams. Code § 54.1-2130 defines a "brokerage relationship" as "the contractual relationship between a client and a real estate licensee who has been engaged by such client for the purpose of procuring a seller, buyer, option, tenant, or landlord ready, able, and willing to sell, buy, option, exchange or rent real estate on behalf of a client." Although Williams was working for VARED at the time of the transactions, there is no evidence to suggest VARED was Williams's client in the transactions. Therefore, there was no broker relationship of which Williams was required to disclose.

Further, in contrast to Taylor's interpretation of the statute, nothing in the plain meaning of Code § 54.1-2138 requires a real estate licensee to disclose the *lack of* a broker relationship to another party to the transaction. Code § 54.1-2138(A) states, "[A] licensee shall disclose any broker relationship the licensee *has* with another party to the transaction." (Emphasis added).[11]

---

[11] Code § 54.1-2138 provides a disclosure "form," noting that the information on the form would be sufficient to meet the requirements of the statute. This sample disclosure notification states:

The undersigned do hereby acknowledge disclosure that:

The licensee _____

(Name of Firm)

represents the following party in a real estate transaction:

_____Seller(s)              or
_____Buyer(s)

_____Landlord(s)            or
_____Tenant(s)

The form provides no place for the licensee to indicate that he does *not* represent a party to the transaction.

When the wording of a statute is clear and unambiguous, its plain meaning is to be accepted, State Bd. of Contractors, 234 Va. at 83, 360 S.E.2d at 171 (citing Marsh, 234 Va. at 13, 360 S.E.2d at 168; Westmoreland Coal Co., 223 Va. at 99, 353 S.E.2d at 760-61), and an agency's interpretation that conflicts with the language of the statute is not to be accorded deference, May Bros., 11 Va. App. at 119, 396 S.E.2d at 697 (citing Bell, 543 F. Supp. at 327). The plain meaning of Code § 54.1-2138 does not support Taylor's interpretation of the statute as requiring the real estate licensee to disclose both a broker relationship and lack of a broker relationship. By its very terms, the statute imposes an affirmative obligation to disclose the *existence* of a circumstance, as opposed to a declaration that the circumstance does *not* exist. Accordingly, the circuit court erred in affirming the Board's decision and holding Williams violated Code § 54.1-2138 when he failed to notify the parties that no brokerage relationship existed in the transactions.

### B. Findings Outside the Specialized Competence of the Agency

In addition to the Board's decision that Williams violated Code § 54.1-2138, the Board accepted Taylor's recommendation that Williams violated five of the Department's regulations. Williams contends the circuit court erred in failing to dismiss Counts III and IV which, Williams argues, were legal issues outside the agency's specialized competence.

"[T]he degree of deference afforded an agency decision depends upon not only the nature of the issue, legal or factual, but also upon whether the issue falls within the area of 'experience and specialized competence of the agency.'" Johnston-Willis, 6 Va. App. at 243, 369 S.E.2d at 8 (quoting Code § 2.2-4027 (formerly Code § 9-6.14:17)). "'If the issue falls outside the area generally entrusted to the agency, and is one in which the courts have a special competence, i.e., the common law or constitutional law, there is little reason for the judiciary to defer to an

administrative interpretation.'" Id. at 243-44, 369 S.E.2d at 8 (quoting Hi-Craft Clothing Co. v. N.L.R.B., 660 F.2d 910, 914-15 (3d Cir. 1981)).

In Count III of Taylor's recommendation, Taylor found Williams failed "to act as a real estate salesperson in such a manner as to safeguard the interest of the public by failing to pay delinquent taxes as required by the Waller contract," in violation of 18 VAC 135-20-260(10). Section 18 VAC 135-20-260(10) states, "Actions constituting unworthy and incompetent conduct include: [f]ailing to act as a real estate broker or salesperson in such a manner as to safeguard the interests of the public."

Williams contends the agreement between him and Waller incorrectly stated that Williams would pay delinquent taxes and fees on the property at closing. Instead, Williams argues the intent of the parties was to have Waller pay those costs. As evidence of the parties' intent, Williams notes that he increased the purchase price from $6,000 to $7,000 only after he discovered the delinquent taxes and fees totaled $6,106.95. Williams argues there would be no need to increase the purchase price unless the parties intended for Waller to pay the taxes and fees. Williams also notes that Waller signed the settlement statement form, which showed that taxes were to be deducted from the seller's proceeds.

Rejecting these arguments in the IFF proceeding, Taylor found "Williams intentionally used his own knowledge as a [real estate] licensee to profit himself at the expense of the seller."

In Count IV of Taylor's recommendation, Taylor found Williams failed "to include the complete terms and conditions of the Waller contract by not clearly stating in the contract who was to pay the taxes." Taylor found that although Williams revised the initial purchase price from $6,000 to $7,000, Williams failed to correct the parties' agreement to reflect that delinquent taxes and related fees increased to $6,106.95. Taylor also found that Williams failed to correct the agreement to reflect that Waller, rather than Williams, would pay taxes and fees.

Accordingly, Taylor found Williams in violation of 18 VAC 135-20-300(6) and she recommended Williams pay a monetary penalty of $2,500 and his license be revoked. The Board accepted her recommendation.

Section 18 VAC 135-20-300(6) states, "Actions constituting misrepresentation or omission, or both, include: [f]ailing to include the complete terms and conditions of the real estate transaction, including but not limited to any lease, property management agreement or offer to purchase."

On appeal to this Court, Williams argues that a determination of these issues depends upon interpretation of the contract between Waller and Williams, an issue outside the specialized competence of the agency. For that reason, Williams contends this Court should not defer to the agency's determination. Instead, he argues the evidence shows the intent of the parties was for Waller to pay the delinquent taxes and fees.

While it is true that this Court must resolve the legal issues involved, we find no error in the circuit court's determination that the Board acted according to law. "'When the terms of a contract are clear and unambiguous, a court must give them their plain meaning.'" Landmark HHH, LLC v. Gi Hwa Park, 277 Va. 50, 55, 671 S.E.2d 143, 146 (2009) (quoting Levica Coal Co. v. Consolidation Coal Co., 276 Va. 44, 57, 662 S.E.2d 44, 51 (2008)). "'A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used.'" Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 632, 561 S.E.2d 663, 668 (2002) (quoting TM Delmarva Power, LLC v. NCP of VA, LLC, 263 Va. 116, 119, 557 S.E.2d 199, 200 (2002)). "Contract language is ambiguous when 'it may be understood in more than one way or when it refers to two or more things at the same time.'" Id. (quoting Granite State Ins. Co. v. Bottoms, 243 Va. 228, 234, 425 S.E.2d 131, 134 (1992)).

The contract between Williams and Waller clearly states, under the section entitled "Additional Terms," "Purchaser will pay delinquent taxes of $4205.35 and related fees in full at closing." The parties never provided a written modification to the contract's terms, nor does Williams contend that the contract's terms were modified. Instead, Williams argues it was always the intent of the parties that Waller would pay taxes and fees at closing.

"When an agreement is plain and unambiguous on its face, the Court will not look for meaning beyond the instrument itself." Id. at 632, 561 S.E.2d at 667 (citing Ross v. Craw, 231 Va. 206, 212, 343 S.E.2d 312, 316 (1986)). Although Williams contends that other evidence, including the settlement statement, showed Waller understood that he was to pay the delinquent taxes and fees, Williams admitted that he made no modification to the contract to reflect a change in the contract's terms. Williams also admitted that he did not pay the taxes and fees as the contract plainly required. A review of the record indicates there was no error of law in the interpretation of the contract between Waller and Williams and the ultimate conclusion that Williams failed to pay delinquent taxes as required by the Waller contract, in violation of 18 VAC 135-20-260(10).

Moreover, the contract specifically and clearly stated that delinquent taxes totaled $4,205.35. However, at settlement Williams deducted $6,106.95 from the purchase price to reflect taxes and fees. Again, the parties never provided a written modification to the contract's terms, nor does Williams contend that the contract's terms were modified. Thus, there was no error of law in concluding Williams failed to include the complete terms and conditions of the transaction in violation of 18 VAC 135-20-300(6).

C. Findings Allegedly in Violation of Williams's Due Process Rights

Next, Williams argues the circuit court erred when it failed to dismiss all of the Board's findings, which Williams argues were in violation of his due process rights. In support of his

argument, Williams provides five assignments of error: (1) Taylor's and the Board's imposition of higher sanctions after Williams declined the consent offer; (2) Taylor's consideration of facts, which were not in the record, to support her recommendation to the Board; (3) the omission of documents from the record, which were submitted for the Board's consideration; (4) Taylor's interpretation of a "material" change to the contracts; and (5) the impact of Williams's disability on the ultimate determination.

"[W]here the legal issues require a determination by the reviewing court whether an agency has, for example, accorded constitutional rights, or failed to observe required procedures, less deference is required and the reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination." Johnston-Willis, 6 Va. App. at 243, 369 S.E.2d at 7-8.

### 1. Increased Sanctions

Williams first argues Taylor's recommendation for sanctions that were more than double the fines proposed in the consent offer and revocation of Williams's real estate license was based solely on the fact that Williams refused the initial consent offer. The circuit court, rejecting Williams's argument, noted

> The Court believes it unusual to have such a disparity in sanctions. . . . The Court notes that the original settlement offer of $4250.00 was more than doubled by the Board, which suggests motives of retaliation or pique. Nonetheless, this Court finds the Board acted according to law, as the facts do not support that this Court "would necessarily come to a different conclusion."

(Citation omitted).

"[D]ue process . . . requires that a defendant be freed of apprehension of . . . retaliatory motivation on the part of the sentencing judge." North Carolina v. Pearce, 395 U.S. 711, 725 (1969), abrogated by Alabama v. Smith, 490 U.S. 794, 802 (1989). However, "[t]here is a presumption that these public officials acted correctly." State Bd. of Health v. Godfrey, 223 Va.

423, 436, 290 S.E.2d 875, 882 (1982).  The burden is on the party citing error to show that "there is a reasonable likelihood that the increase in [sanction] is the product of actual vindictiveness on the part of the [sanctioning] authority."  Smith, 490 U.S. at 799 (citing United States v. Goodwin, 457 U.S. 368, 373 (1982)).

The Board does not dispute that the Department offered Williams a consent offer of $4,250 in fines and completion of an ethics course.  According to the consent offer, the recommendation was based on Williams's failure to disclose his brokerage relationship to Waller and Thacker, Williams's failure to deposit $1.00 into an escrow account as required by the Waller contract, and Williams's failure to safeguard the interests of the public by requiring Waller to pay delinquent taxes and fees without providing Waller with notice of a change to the contract.  After Williams declined the consent offer, the Department conducted an IFF, in which Taylor, the presiding board member, heard testimony from Williams, Pintz, and the closing agent involved in the Waller transaction.  At the hearing in circuit court, Taylor testified that the basis of her recommendation to the Board "was the evidence that [she] received at the IFF," including the demeanor of the witnesses, "[h]ow they came across," the terms of the contract, the disclosures made by Williams, and the money collected by the parties.  Taylor specifically found Pintz credible and noted his account of the facts in her summary of the IFF:

> Williams contends that his principal broker, Pintz, instructed him to keep the [deposit] in Williams' personal transaction file and to keep this file at home.  It is hard to believe any principal broker would commit such a violation of the Board's regulations by rejecting [a] deposit and ratified contract as suggested by Williams.  Pintz testified during the IFF that he never instructed Williams to do this as Pintz was unaware of the details of this transaction between Williams and Waller until some time after the contract had been ratified and the [money] was due for deposit.
>
> Pintz explained that [escrow money] is not deposited until a contract is ratified.  Pintz stated he was never presented with a ratified contract from Williams for the Waller transaction and I

- 16 -

> believe this statement. Pintz could have done things better, but that does not lead me to believe he is lying about what happened. I would assume if Pintz was to lie he would do so in a manner to cast his actions in the best light possible, not in such a manner to show he could have done things better. [Williams's] counsel aggressively questioned Pintz for more than an hour. During the IFF, I carefully observed Pintz and listened to his answers. Pintz's answers were consistent throughout the IFF. I believe Pintz is credible and told the truth.

Taylor's recommendation was based on testimony from the witnesses present at the IFF and other evidence collected *after* the consent offer was made.

Further, Schroder testified that after the consent offer was made and declined, the Department added two additional charges against Williams for failing to deposit $1,000 according to the terms of the Thacker contract and failing to provide written notice to Thacker that a material change to the contract was made. Schroder testified that these charges were added "based on [a] telephone conversation [he] had with [Williams's counsel]." Schroder noted that in reviewing Williams's "interview memorandum," Schroder "realized that [Williams] admitted that he did not turn in the [deposit] money [and] admitted he kept the file himself instead of giving it to his broker."

As was the case with all of Williams's due process claims, the circuit court conscientiously considered Williams's claim that the ultimate sanctions were unfair in light of the previous consent offer. Although, as the circuit court found, the disparity in the sanctions offered in the consent order and the sanctions ultimately imposed by the Board was great, "suggest[ing] motives of retaliation or pique," Williams failed to show *a reasonable likelihood* that the increase was "the product of actual vindictiveness on the part of the [sanctioning] authority," in light of all the evidence presented to the Board. Smith, 490 U.S. at 799 (citing Goodwin, 457 U.S. at 373). Accordingly, we find no error in the circuit court's determination

that the sanctions recommended by Taylor and accepted by the Board were based on sufficient evidence in the record and not a vindictive response to Williams declining the consent offer.

### 2. Taylor's Consideration of the Tax Assessment

Williams further assigns error to the fact that Taylor admitted to considering a tax assessment on Waller's property, which was not introduced as evidence into the record, in reaching her decision.

In the hearing before the circuit court, Taylor responded that it was her "opinion" that Williams took advantage of Waller based on the fact that Williams misrepresented who was going to pay the taxes and because "[t]he county assessment was higher than any amount of money [Waller] got or received." When the circuit court asked Taylor how she learned of the tax assessment when it was not in the agency's record, Taylor stated that she found the tax assessment "online." Taylor further admitted that is "was one of the reasons" for her opinion.

"Members of an administrative body cannot decide issues on personal knowledge, but must rely upon the evidence produced before them." Johnston-Willis, 6 Va. App. at 258, 269 S.E.2d at 16 (citing Skyline Swannanoa, Inc. v. Nelson Cnty., 186 Va. 878, 886, 44 S.E.2d 437, 441 (1947)). "However, the rules of evidence are relaxed in an administrative proceeding and the findings will not be reversed solely because the [presiding member] considered evidence not in the record." Id. "'[T]he mere fact that the [agency] has looked beyond the record does not invalidate its action unless substantial prejudice is shown to result.'" Id. (quoting United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 530 (1946) (alterations in Johnston-Willis)). "'No reversible error will be found . . . unless there is a clear showing of prejudice arising from the admission of such evidence, or unless it is plain that the agency's conclusions were determined by the improper evidence, *and that a contrary result would have been reached in its*

- 18 -

*absence*.'" Id. (quoting Va. Real Estate Comm'n v. Bias, 226 Va. 264, 270, 308 S.E.2d 123, 126 (1983) (alteration in Johnston-Willis)) (emphasis added).

Although Taylor admitted considering the tax assessment, there is nothing in the record to suggest that a contrary result would have been reached in the absence of this evidence. Moreover, this evidence would not have led Taylor to conclude that Williams failed to properly deposit the escrow money, that Williams failed to advise the parties of a material change to the contracts, or that Williams failed to adhere to the contracts' terms. Thus, the tax assessment, albeit improperly considered, was irrelevant to the findings from which Williams appeals. Further, although Taylor admitted to considering the tax assessment, the assessment was not presented to the Board. Therefore, the Board could not have relied on the information when determining the appropriateness of Taylor's recommendation.

### 3. Failure of the Board to Consider the Entire Record

Next, Williams assigns error to the fact that the Board was not presented with Matthews's investigation notes, the consent offer, or Taylor's notes from the IFF hearing. The burden is on Williams to demonstrate that the documents he requested be made part of the record were, or should have been, part of the agency record considered by the Board. Rule 2A:3(b); see also Roanoke Mem'l Hosps. v. Kenley, 3 Va. App. 599, 603, 352 S.E.2d 525, 527 (1987) (noting the burden is upon the party complaining of the agency action to demonstrate an error of law subject to review).

Williams argues the Board violated Code § 2.2-4019(A)(ii), which provides that a licensee, in person or by counsel, has the right to appear before an agency "or its subordinates, or before a hearing officer for the informal presentation of factual data, argument, or proof in connection with any case." However, nothing in this provision authorized Williams to present evidence to the hearing officer for an unlimited duration of time. In contrast, during the hearing

in circuit court, Schroder testified that the "record closes on the day the IFF is held," unless the hearing officer grants the parties permission to leave the record open. Williams admits that the documents he sought to introduce into the record were submitted after the IFF and without specific authorization from the hearing officer. Accordingly, Williams failed to demonstrate that the documents should have been part of the agency record considered by the Board.

### 4. Taylor's Interpretation of a "Material" Change

In Count II of Taylor's summary of the IFF and recommendation to the Board, Taylor found Williams failed to deposit $1.00 as required by the Waller contract within five days of the contract's ratification. At the IFF, Williams argued that even if he failed to make the deposit, the deposit was not a material requirement because it was only a small amount. Taylor found "the location of the [deposit] and whether or not it is placed in a properly labeled escrow account is the material issue, not the amount of the [deposit]." Finding Williams failed to make the deposit according to the terms of the agreement, Taylor recommended the Board find Williams in violation of 18 VAC 135-20-180(B)(1)(a), fine Williams $1,000, and revoke his license.

In Count V of Taylor's recommendation, Taylor found Williams failed "to provide in a timely manner to all principals to the transaction written notice of a[] material change to the Waller contract, the holder of the [deposit] and type of account." Taylor noted that Williams knew the $1.00 deposit on the Waller contract had not been made with Courthouse Title, yet "Waller was neither verbally nor in writing told of this change." Accordingly, Taylor found Williams in violation of 18 VAC 135-20-310(2) and recommended Williams pay a monetary penalty of $1,000 and his license be revoked.

In Count VIII of Taylor's recommendation, Taylor found Williams failed "to provide in a timely manner to all principals to the transaction written notice of a[] material change to the Thacker contract, that the [deposit] was not deposited by the deadline in the contract." Taylor

found that when the $1,000 deposit was not made with the escrow agent by March 23, 2005, as required by the contract and the Board's regulations, such a change was material and should have been immediately communicated to the principals, yet Williams did not notify Thacker of the change. Accordingly, Taylor recommended Williams pay a monetary penalty of $1,000 and his license be revoked.

On appeal, Williams contends that Taylor improperly found Williams in violation of these regulations because the changes to the contract were not "material." "[T]he interpretation which an administrative agency gives its regulation must be accorded great deference . . . ." Va. Real Estate Bd. v. Clay, 9 Va. App. 152, 159, 384 S.E.2d 622, 626 (1989). "The trial courts may reverse the administrative agency's interpretation only if the agency's construction of its regulation is arbitrary or capricious or fails to fulfill the agency's purpose as defined by its basic law." Id. at 161, 384 S.E.2d at 627 (citing Johnston-Willis, 6 Va. App. at 246, 369 S.E.2d at 9).

The parties agree that the purpose of the escrow deposit is to protect the seller should the contract not be completed. The Department heavily regulates maintenance and management of escrow accounts.

> If money is to be held in escrow, each firm or sole proprietorship shall maintain . . . one or more federally insured separate escrow accounts in a federally insured depository in Virginia into which all . . . earnest money deposits . . . shall be deposited unless all principals to the transaction have agreed otherwise in writing.

18 VAC 135-20-180(A)(1).

> Upon the ratification of a contract, earnest money deposits . . . must be placed in an escrow account by the end of the fifth business banking day following ratification, unless otherwise agreed to in writing by the parties to the transaction, and shall remain in that account until the transaction has been consummated or terminated.

18 VAC 135-20-180(B)(1)(a). The parties agreed upon a sum certain deposit amount and a time by which that deposit must be made into an escrow account. If these terms were not material, then use of the escrow account would be rendered meaningless. Given the purpose of the escrow money, the Department's regulations, and this Court's standard of review, we conclude that it was neither arbitrary and capricious nor unreasonable for the Board to find the terms governing the earnest money deposit, which the parties agreed to in writing, material.[12]

### 5. Impact of Williams's Disability

In Williams's final contention that his due process rights were violated, he asserts that Taylor and the Board should have considered his disability an explanatory factor for his actions. Specifically, Williams contends that his failure to properly explain the drafting errors in the Waller contract resulted from his brain injury.

"As the factfinder, the [agency] is charged with the responsibility of resolving questions of credibility and of controverted facts. The [Board] must also determine whether the [regulant's] evidence sufficiently mitigates the violations." Va. Emp't Comm'n v. Gantt, 7 Va. App. 631, 635, 376 S.E.2d 808, 811 (1989). "The sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision. The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion." Johnston-Willis, 6 Va. App. at 242, 369 S.E.2d at 7 (citing Bias, 226 Va. at 269, 308 S.E.2d at 125; Roanoke Mem'l Hosps., 3 Va. App. at 610, 352 S.E.2d at 531; Kenley v. Waterway Estates, Ltd., 3 Va. App. 50, 56, 348 S.E.2d 31, 34 (1986)).

---

[12] Williams also contends the Board failed to show that harm resulted from Williams's failure to deposit the escrow money timely or at all. Neither 18 VAC 135-20-180 nor 18 VAC 135-20-310, the regulations under which Williams was charged, requires a finding of harm to the parties.

Although Williams requested a continuance of the IFF based in part on the brain injury he suffered just prior to the IFF, Williams presented no evidence to support his contention that his failure to properly draft the contracts, comply with the terms of the contracts, or provide written notice of changes to those terms resulted from his injury. As Williams has the burden to demonstrate that an error of law occurred, Roanoke Mem'l Hosps., 3 Va. App. at 603, 352 S.E.2d at 527, and he has presented no evidence to support his contention, we cannot say that a reasonable mind would necessarily come to a different conclusion.

### D. Findings Allegedly Arbitrary and Capricious

Finally, Williams argues the circuit court erred when it failed to dismiss the Board's findings and sanctions as being arbitrary, capricious, and an abuse of power. "'[T]he [administrative agency] shall apply expert discretion to matters coming within its cognizance, and judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of the delegated discretion.'" Johnston-Willis, 6 Va. App. at 244, 369 S.E.2d at 8 (quoting Va. Alcoholic Beverage Control Comm'n v. York St. Inn, Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979)). An agency's actions are arbitrary and capricious when they are "willful and unreasonable" and taken "without consideration or in disregard of facts or law or without determining principle." Sch. Bd. of the City of Norfolk v. Wescott, 254 Va. 218, 224, 492 S.E.2d 146, 150 (1997). "There is a presumption that these public officials acted correctly." Godfrey, 223 Va. at 436, 290 S.E.2d at 882.

"The sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision. The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion." Johnston-Willis, 6 Va. App. at 242, 369 S.E.2d at 7 (citing

- 23 -

Bias, 226 Va. at 269, 308 S.E.2d at 125; Roanoke Mem'l Hosps., 3 Va. App. at 610, 352 S.E.2d at 531; Waterway Estates, Ltd., 3 Va. App. at 56, 348 S.E.2d at 34).

The record reflects substantial evidence supporting the conclusions made by the Board. Although Williams argued that the contracts did not properly reflect the agreement of the parties, Williams admitted that he failed to deposit money into the escrow accounts and failed to notify the parties in writing of changes to the respective contracts' terms. Taylor clearly credited Pintz and the other evidence and did not find Williams entirely credible. See Gantt, 7 Va. App. at 635, 376 S.E.2d at 811 (noting that "[a]s the factfinder, the [agency] is charged with the responsibility of resolving questions of credibility").

Williams suggests that further interviews with Waller would show that Waller understood the parties' intent was that Waller would pay delinquent taxes and related fees on his property at closing. However, the burden is upon Williams to present sufficient evidence to mitigate the violations. Id.; Roanoke Mem'l Hosps., 3 Va. App. at 603, 352 S.E.2d at 527; see also Thurston v. Maggard, 220 Va. 815, 819, 263 S.E.2d 65, 66-67 (1980) (noting, "the burden of going forward with evidence to show that it was not [one party's] intention to [act according to the unambiguous terms of an agreement falls] upon those who oppose [the] claim"). Williams neither subpoenaed Waller nor presented any evidence to show Waller agreed to a contractual change. Substantial evidence supported the Board's conclusion that Williams failed to pay taxes and fees as stated in the Waller contract and that Williams failed to modify the terms of the contract to reflect the ultimate terms of the agreement. Thus, we cannot conclude that a reasonable mind would necessarily come to a different conclusion. Bias, 226 Va. at 269, 308 S.E.2d at 125.

Code § 54.1-201(7) entrusts the agency with the power to "place a regulant on probation or revoke, suspend or fail to renew a certificate or license for just causes as enumerated in

regulations of the board." Code § 54.1-202 further provides, "If a regulatory board determines that a respondent is guilty of the violation complained of, the board shall determine the amount of the monetary penalty for the violation, which shall not exceed $2,500 for each violation." The sanctions imposed for each violation, albeit stringent, fall within the statutory authority of the Board. Accordingly, the circuit court did not err in concluding the Board's sanctions were neither arbitrary nor an abuse of power.

## III. CONCLUSION

For these reasons, we reverse the decision of the circuit court upholding the Board's conclusion that Williams violated Code § 54.1-2138. Accordingly, we vacate the imposition of $1,000 in fines and eight hours of continuing education, the sanctions for these violations. We affirm the circuit court's decision in all other respects.

<u>Affirmed in part, reversed in part, and final judgment.</u>