COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, Russell and Malveaux
Argued by videoconference


NORTH VIEW HOME FOR ADULTS, LLC
                                            MEMORANDUM OPINION[*] BY
v.        Record No. 1006-20-2          JUDGE MARY BENNETT MALVEAUX
                                               MAY 18, 2021
VIRGINIA DEPARTMENT OF HEALTH


FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY
J. William Watson, Jr., Judge

Mark Englisby (Bourdow, Bowen & Ellis, on brief), for appellant.

Grant E. Kronenberg, Assistant Attorney General (Mark R. Herring,
Attorney General; Donald D. Anderson, Deputy Attorney General;
Paul Kugelman, Jr., Senior Assistant Attorney General and Section
Chief, Environmental, on brief), for appellee.


North View Home for Adults, LLC ("North View") appeals an order of the Mecklenburg

County Circuit Court ("circuit court") that upheld the Virginia Department of Health's ("VDH")

determination that North View's water system qualifies as a "waterworks" under Virginia law.  For

the following reasons, we affirm the decision of the circuit court.

I.  BACKGROUND

North View is an assisted living facility owned by Beverly Hargrove in Mecklenburg

County.  The facility, which operates year-round, provides assisted living for residents with

mental illness and intellectual disabilities.  Prior to October 2017, the facility used a single well

on its property as the water source for its residents and staff.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

In February 2016, VDH sent a letter to Hargrove explaining that, based on North View's responses to a VDH questionnaire, the water system at North View appeared to meet the definition of a "waterworks" as defined in Code § 32.1-167.[1] That code section defines a waterworks as "a system that serves piped water for human consumption to at least 15 service connections or 25 or more individuals for at least 60 days out of the year."

On June 8, 2017, VDH held an informal fact finding proceeding ("IFFP") to determine if the water system serving North View was a waterworks. The presiding officer issued a case decision on August 7, 2017, finding that the water system did qualify as a waterworks under the statute and its corresponding regulation.[2]

North View challenged the decision and requested a formal hearing. Prior to the formal hearing, VDH learned that North View had modified its water system in October 2017 by installing and connecting a second well and reconfiguring some pipes within the facility to use water from the second well. By request of VDH, the hearing officer remanded the case back to the agency for consideration of whether the water system, as modified, still met the definition of a waterworks. VDH conducted a second IFFP on August 6, 2018, and on November 9, 2018, the presiding officer issued a case decision upholding the earlier determination that the water system met the definition of a waterworks.

Following the second IFFP, North View again requested a formal hearing. On May 22, 2019, a formal hearing before a hearing officer was held in which the parties presented evidence as to whether the facility's water system was a "waterworks" per Code § 32.1-167.

---

[1] The questionnaire was part of a state-wide initiative by the agency to evaluate facilities that operated their own water source to determine whether those facilities met the definition of a waterworks under Code § 32.1-167 and thus needed to be regulated by VDH.

[2] See 12 VAC 5-590-10.

VDH provided the hearing officer with Virginia Department of Social Services ("DSS") records showing that the total capacity of the facility is twenty-three residents. DSS inspection reports further reflected that North View had eighteen residents in care in April 2019, twenty residents in care in June 2018, twenty-one residents in care in August 2016, twenty-one residents in care in May 2016, twenty residents in care in May 2015, and twenty residents in care in June 2014.

At the hearing, Hargrove testified that North View staff assist the residents with "daily living activities such as bathing [and] brushing their teeth." Staff at the facility also serve breakfast and dinner to residents each day and clean up following the meals.

At the time of the hearing, the facility had two full-time and eight part-time employees. Prior to the recent death of a staff member, North View had had eleven employees. Hargrove described the facility's schedules as follows. All residents attend day programs from 8:00 a.m. to 4:30 p.m. From Monday through Saturday, between 8:00 a.m. and 4:00 p.m., two staff members and Hargrove generally are present at the facility. From 4:00 p.m. to 6:30 p.m., two different staff members are on duty along with Hargrove. Another two staff members work the night shift, which starts at 6:30 p.m. On Sundays, two staff members are present throughout the day. Hargrove testified that the maximum number of staff present at the facility at any time is four. She also stated that there are few visitors to the facility.

Hargrove further testified that she added a second well to the property in October 2017 "[t]o try to divide the population" and because she was thinking of expanding the facility. North View provided a diagram of its facility, which consists of a single building. The diagram shows that one well, labeled "Well #1 Residents," is connected to a three-basin sink in the kitchen, the men's restroom, another restroom, the laundry facility, and an eighty-gallon hot water tank. The second well, labeled "Well #2 Staff," is connected to a restroom adjacent to the main office, a

staff restroom in the kitchen area, a handwashing sink, a utility sink, and a fifty-gallon hot water tank. Ron Hargrove, North View's maintenance director, testified that one pipe from each well directs water into the facility. At the hearing, a representative of DHS did not "contest that the facilities are separated, and that the well water is distinct between the two" as the wells came "[f]rom separate sources."

North View also introduced a document titled "Rights and Responsibilities of Residents" that includes the provision that "staff is not permitted to use any facilities distinctly labeled and or assigned for use by the residents only, this includes bathroom and kitchen area as indicated." North View also provided a document titled "Standard Operating Procedure" that indicates that the purpose of the policy is "[t]o keep the users of the two wells located on the premises of North View . . . limited to separate, distinct populations that are limited to 24 users." The procedures document further indicates that staff are not to the use the bathroom located in the resident area and are instead only to use the staff restroom.

Hargrove testified that staff are subject to discipline for violating these procedures, and that to her knowledge, no staff member had violated the policy against use of the residential bathroom. Further, she testified that residents do not have access to the staff bathroom, which is "locked off." Hargrove testified that staff members do not prepare food for themselves in the kitchen. North View also provided a picture of a sink in its facility labeled "Employees Only."

Bernard Proctor, an engineer with VDH, conducted a site visit of North View. During the hearing, he described the kitchen and dining area as "open" and "one large room" with the kitchen at one end and no dividing partitions. If they were in the dining area, residents would be able to walk up to and access the kitchen sink and handwashing sink in that room. Proctor admitted that there were no residents present during his site visit and therefore he did not observe any residents using staff sinks.

- 4 -

Following the formal hearing, on August 23, 2019, the hearing officer provided his recommended decision recommending that the State Health Commissioner ("the Commissioner") affirm the findings of the prior IFFPs that North View's water system qualified as a waterworks under Code § 32.1-167.

VDH issued its case decision on September 19, 2019, in which the Commissioner found that the water system at North View met the requirements of a "waterworks" as defined by the Code. The Commissioner found that North View provided "water for human consumption to 25 or more people 60 or more days a year" based on the DSS inspection reports and Hargrove's testimony that demonstrated that "[t]he population served consist[ed] of 18 to 21 residents . . . and 10 staff, of which 7 [were] present on most days." The Commissioner also noted that the population served may be greater because the facility's license allows as many as twenty-three residents and, until recently, North View had employed eleven staff members.

On November 20, 2019, North View filed a petition for appeal in the circuit court. On July 8, 2020, the circuit court held a hearing on the matter, and on August 3, 2020, issued an order affirming the Commissioner's decision. In its order, the circuit court found "that the agency acted in accordance with applicable law, did not commit any procedural errors, and there is substantial evidence in the agency record to support the decision of the State Health Commissioner that [North View's] water system is a waterworks under the Public Water Supplies law." This appeal followed.

## II. ANALYSIS

The Virginia Administrative Process Act ("VAPA"), Code §§ 2.2-4000 to -4031, authorizes judicial review of agency decisions. See Code § 2.2-4027. On appeal of an agency decision under the VAPA, the party complaining of agency action "bears the 'burden of

demonstrat[ing] an error . . . subject to review.'" Va. Bd. of Med. v. Hagmann, 67 Va. App. 488,

499 (2017) (alterations in original) (quoting Code § 2.2-4027).  Such errors include as follows:

> (i) accordance with constitutional right, power, privilege, or
> immunity, (ii) compliance with statutory authority, jurisdiction
> limitations, or right as provided in the basic laws as to subject
> matter, the stated objectives for which regulations may be made,
> and the factual showing respecting violations or entitlement in
> connection with case decisions, (iii) observance of required
> procedure where any failure therein is not mere harmless error, and
> (iv) the substantiality of the evidentiary support for findings of
> fact.

Code § 2.2-4027.

"Under the VAPA, the governing standard of review depends on the nature of the

controversy."  New Age Care, LLC v. Juran, 71 Va. App. 407, 420 (2020) (quoting Citland, Ltd.

v. Commonwealth ex rel. Kilgore, 45 Va. App. 268, 274 (2005)).  "[W]ith respect to . . . issues

of law" on appeal, this Court's duty under the VAPA is "to review the agency decision *de novo*."

Code § 2.2-4027.  "Virginia courts do not delegate [the task of statutory interpretation] to

executive agencies."  Moore v. Brown, 63 Va. App. 375, 380 (2014) (quoting Va. Emp. Comm'n

v. Cmty. Alts., Inc., 57 Va. App. 700, 708 (2011)).

However, "we take a very different approach to interpreting administrative regulations."

Fam. Redirection Inst., Inc. v. Dep't of Med. Assistance Servs., 61 Va. App. 765, 772 (2013).

When reviewing claims of regulatory interpretive error in an administrative appeal, we are to

"give 'great deference' to an agency's interpretation of its own regulations."  Bd. of Supervisors

v. State Bldg. Code Tech. Rev. Bd., 52 Va. App. 460, 466 (2008).  "This deference stems from

Code § 2.2-4027, which requires that reviewing courts 'take due account' of the 'experience and

specialized competence of the agency' promulgating the regulation."  Id. (quoting Va. Real Est.

Bd. v. Clay, 9 Va. App. 152, 160-61 (1989)).  But this Court gives no deference to an agency's

interpretation of its own regulation that is "arbitrary and capricious," meaning an interpretation

that is "unreasonable" and taken "without determining principle." Williams v. Commonwealth of Va. Real Est. Bd., 57 Va. App. 108, 135 (2010) (quoting Sch. Bd. of the City of Norfolk v. Wescott, 254 Va. 218, 224 (1997)).

"Questions of fact, by contrast, are reviewed under a substantial evidence standard." Berglund Chevrolet, Inc. v. DMV, 71 Va. App. 747, 752 (2020); see also Code § 2.2-4027. "Under that standard, substantial evidence is 'such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion.'" State Health Comm'r v. Sentara Norfolk Gen. Hosp., 260 Va. 267, 275 (2000) (quoting Va. Real Est. Comm'n v. Bias, 226 Va. 264, 268-69 (1983)). "An agency's factual findings should only be rejected if, 'considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'" Id. at 275-76 (quoting Bias, 226 Va. at 269). In addition, "a reviewing court considers the agency record in its entirety, reviewing the facts in the light most favorable to sustaining the agency's decision." Va. Ret. Sys. v. Blair, 64 Va. App. 756, 770 (2015).

> Interrelated factual and legal issues must be considered together in the context of the entire record, with each examined under the appropriate standard of review. The court may then discharge its statutory duty and "determine . . . whether the result reached . . . could reasonably be said, . . . to be within the scope of the legal authority of the agency."

Env't Def. Fund, Inc. v. Va. State Water Control Bd., 15 Va. App. 271, 279 (1992) (alterations in original) (quoting former Code § 9-6.14:17 (now Code § 2.2-4027)).

On appeal, North View argues that the circuit court erred in affirming VDH's determination that its water system met the definition of a waterworks under Virginia law. For the following reasons, we disagree.

Congress enacted the Safe Water Drinking Act ("SWDA"), 42 U.S.C. §§ 300f to 300j, in 1974 "to assure that water supply systems serving the public meet minimum national standards for protection of public health." City of Evansville, Inc. v. Ky. Liquid Recycling, 604 F.2d 1008,

1016 n.25 (7th Cir. 1979) (quoting H.R. Rep. No. 93-1185, 93rd Cong., 2d Sess. 1, 10 (1974)). "States can be delegated primary enforcement responsibility, or primacy, for the SDWA within their borders by adopting and implementing drinking water regulations 'no less stringent than the national primary drinking water regulations' and sufficient procedures for enforcement." Ind. Dep't of Env't Mgmt. v. Constr. Mgmt. Assocs., 890 N.E.2d 107, 109 (Ind. Ct. App. 2008) (quoting 42 U.S.C.A. § 300g-2(a)). In Virginia, the Commissioner, assisted by VDH, and the Board of Health have been charged by the General Assembly with protecting the public health. See Code § 32.1-2. To that end, VDH has primary enforcement authority in Virginia with respect to implementing the federal SWDA. See Report of the Department of Health on The Impact of the Safe Drinking Water Act Amendments of 1986 on the Commonwealth of Virginia, House Document No. 30, at 15-16 (1990).

The statutory scheme implementing the SWDA in Virginia is Virginia's Public Water Supplies Law, codified at Code §§ 32.1-167 to 32.1-176. The Public Water Supplies Law provides authority for VDH to administer the drinking water program. See Code § 32.1-169 (providing the Board of Health with authority to exercise "general supervision and control over all water supplies and waterworks in the Commonwealth"); Code § 32.1-20 (vesting the Commissioner with the authority of the Board of Health when the Board is not in session, "subject to such rules and regulations as may be prescribed by the Board"). The statutory scheme also establishes requirements for waterworks in Virginia. One such requirement is that "owner[s]" are required to hold a written permit from the Commissioner in order to "establish, construct or operate" a waterworks in Virginia. Code § 32.1-172(A). An "owner" is "an individual, group of individuals, partnership, firm, association, institution, corporation, governmental entity, or the federal government, that supplies . . . water to any person within this

Commonwealth from or by means of any waterworks." Code § 32.1-167. In turn, a "waterworks" is defined as follows:

> a system that serves piped water for human consumption to at least 15 service connections or 25 or more individuals for at least 60 days out of the year. "Waterworks" includes all structures, equipment, and appurtenances used in the storage, collection, purification, treatment, and distribution of pure water except the piping and fixtures inside the building where such water is delivered.

Id.

The code section also provides a definition of "human consumption" as "drinking, food preparation, dishwashing, bathing, showering, hand washing, teeth brushing, and maintaining oral hygiene." Id.[3]

Code § 32.1-167 clearly sets out four requirements for a water system to fall under its definition of a "waterworks." The system must (1) serve piped water; (2) for human consumption; (3) for at least fifteen service connections or twenty-five or more individuals; and (4) for at least sixty days out of the year.

Here, contrary to appellant's argument, the record provides ample evidence that North View's wells meet the requirements to be considered a waterworks under Code § 32.1-167.

First, North View did not dispute before the agency or circuit court that its wells serve piped water as required by the statute.

Second, as noted above, the definition of "human consumption" provided by Code § 32.1-167 includes activities such as "drinking, food preparation, dishwashing, bathing, showering, hand washing, teeth brushing, and maintaining oral hygiene." North View provides

---

[3] The General Assembly has also authorized the Board of Health to enact regulations governing waterworks, including requirements for the issuance of permits. Code § 32.1-170. The waterworks regulations contain definitions for "waterworks" and "human consumption" that mirror the statutory definitions. See 12 VAC 5-590-10.

assisted living for residents with mental illness and intellectual disabilities. Hargrove testified that staff assist the residents with "daily living activities such as bathing [and] brushing their teeth." In addition, she stated that staff at the facility serve breakfast and dinner to residents each day and clean up following the meals. Hargrove's testimony that the staff help residents with bathing and teeth brushing and that they prepare and clean up after meals established that the water piped into the facility from the wells is used for human consumption, as defined in Code § 32.1-167.

Third, evidence in the record also supports the determination that North View's water system serves "at least 15 service connections or 25 or more individuals." Code § 32.1-167. Here, VDH found that "the population served consists of 18 to 21 residents . . . and 10 staff, of which 7 are present on most days." These findings are reasonable as they are supported by evidence in the record. DSS records show that between 2014 and 2019, North View had between eighteen and twenty-one residents. Hargrove's testimony further established that during the week, two staff members work the day shift, another two staff work an early evening shift, and another two staff work the night shift. Further, Hargrove testified that she is also present throughout the day. This accounting of staff schedules supports VDH's finding that seven staff members are present most days of the week. Even using the lowest residential population recorded in DSS's records—eighteen—that residential population plus seven staff members totals twenty-five individuals as required by Code § 32.1-167.

Fourth, and finally, North View stipulated that its facility operates year-round, fulfilling the statute's requirement that the piped water be served to individuals "for at least 60 days out of the year." Code § 32.1-167.

Accordingly, we conclude that substantial evidence in the record supports VDH's determination that North View's water system is a waterworks as defined by Code § 32.1-167.

However, contrary to this conclusion, North View presents two arguments in support of its contention that its water system is not a waterworks per the definition provided in Code § 32.1-167. We reject both based on our review of the statute and evidence in the record.

North View asserts that there was no evidence that it served piped water to more than twenty-five individuals as required by the statute. In doing so, North View urges us to view the requirement of "25 or more individuals" in Code § 32.1-167 as meaning that the facility must serve piped water to twenty-five or more individuals in the facility *all at the same time of day* to qualify as a waterworks. This view does not comport with our reading of the plain language of the statute. When interpreting a statute, "courts apply the plain meaning . . . unless the terms are ambiguous or applying the plain language would lead to an absurd result." Miller & Rhoads Bldg., LLC v. City of Richmond, 292 Va. 537, 541 (2016) (alteration in original) (quoting Baker v. Commonwealth, 284 Va. 572, 576 (2012)). "Thus, the paramount principle of statutory interpretation is 'to interpret the statute as written.'" Id. at 542 (quoting City of Lynchburg v. Suttenfield, 177 Va. 212, 221 (1941)). Code § 32.1-167 provides that a water system qualifies as a waterworks when it provides piped water to "25 or more individuals for at least 60 days out of the year." The statute lacks any requirement that the twenty-five individuals be served water at the same time during the day. Rather, it simply provides that twenty-five or more individuals must be served water on a per day basis, requiring water service for sixty days of the year in order for a water system to qualify as a waterworks. We will not read into the statute an additional requirement that does not exist. Here, VDH's determination that the "25 or more individuals" requirement is satisfied by a cumulative daily number of individuals equaling or exceeding twenty-five is not contrary to the language of the statute, and thus we do not find it erroneous on appeal.

North View also argues that because its separate wells each serve fewer than twenty-five individuals, the facility's wells cannot be considered a waterworks. North View supports this argument by noting that the wells are completely separate with no interconnections and that it has adopted internal policies for staff and residents requiring that each group only use water from the well assigned to that group. However, while North View's water comes from two separate wells, the facility itself consists of a single building where residents live and staff work. The kitchen and dining area is "one large room" without dividing partitions. Residents can access both the kitchen and handwashing sinks while in that area. In addition, staff assist the residents with "daily living activities such as bathing[and] brushing their teeth," and in doing so, utilize the well water intended for resident use only. While North View took steps to separate the water from each well, we conclude that because the facility consists of a single building, and because of the nature of the care provided by the facility, the evidence at the hearing established that water from each well serves twenty-five or more individuals as required by the statute.[4]

Despite its efforts, North View's two wells constitute "a system that serves piped water for human consumption to at least 15 service connections or 25 or more individuals for at least 60 days out of the year." Code § 32.1-167.[5] Therefore, we conclude that VDH did not err in reaching this same determination.

---

[4] North View also supports its argument that its two wells mean that its water system is not a waterworks by relying on a guidance document from VDH. That document, Working Memo 896, states that a water system with multiple sources can fall below the threshold to qualify as a waterworks "by removing physical interconnections between sources, such that one or more sources is directed to a discrete service zone of fewer than 15 connections and less than 25 individuals." However, this example provides that a water system may not qualify as a waterworks when one source is directed to a "discrete service zone." Here, the two wells provide piped water to the exact same service zone—the single building where residents live and staff work in assisting the residents with daily tasks.

[5] North View further argues that VDH lacks jurisdiction to regulate private wells and that its wells fall under the definition of a private well provided in Code § 32.1-176.3. See Code § 32.1-176.3 (defining "[p]rivate well" as "any water well constructed for a person on land

- 12 -

III. CONCLUSION

For the reasons set forth above, we affirm the decision of the circuit court upholding

VDH's case decision.

Affirmed.

_____

which is owned or leased by that person and is usually intended for household, ground water source heat pump, agricultural use, industrial use or other nonpublic water well"). While North View's wells may meet the definition of a private well under that statute, Virginia's Public Water Supplies Law contemplates that private wells are subject to regulation by VDH. As noted above, "owner[s]" are required to hold a permit from the Commissioner in order to "establish, construct or operate" a waterworks in Virginia. Code § 32.1-172(A). An "owner" is defined as "an individual, group of individuals, partnership, firm, association, institution, corporation, governmental entity, or the federal government, that supplies or proposes to supply water to any person within this Commonwealth from or by means of any waterworks." Code § 32.1-167. The definition of "owner" does not specify the source of the water being supplied. Rather, it expressly contemplates a private owner as the definition encompasses both private and public ownership. Thus, the Code does not exempt private wells from the possible water sources for a waterworks. Instead, the definition of "owner" simply refers to supplying water to any person in Virginia via a waterworks. If the water system qualifies as a waterworks, and someone is using that waterworks to supply water to anyone in Virginia, that person is an "owner" and must hold a written permit from the Commissioner in order to be able to legally supply that water.

North View also claims that because it never submitted an application to be regulated as a waterworks, VDH lacks jurisdiction to regulate it. However, Code § 32.1-172(A) states that "[n]o owner shall establish, construct or operate any waterworks or water supply in the Commonwealth without a written permit from the Commissioner . . . ." Here, North View, as the owner of a waterworks, was not able to operate without a permit. VDH had other enforcement options, either criminal enforcement or civil enforcement, see Code §§ 32.1-27(A), (B) and 32.1-176, but chose instead to begin the administrative process by initiating an IFFP under VAPA, see Code § 2.2-4019. Despite North View's lack of an application for a permit for a waterworks, VDH was within its authority under VAPA to begin the administrative process and eventually issue a case decision determining that such a permit was necessary.

- 13 -